Brought a whole lot up there with you Mr. Addison, you going to be able to deal with all that paper up there, or was that to intimidate the bench to see you brought all that up? Osmosis, your honor. All right, you're up and you're on. May it please the court, Rick Addison and Tim Ward on behalf of the plaintiffs' appellants, I'll stop by saying it is always a privilege to appear in the United States Court of Appeals for the Fifth Circuit, particularly before such an august panel. And I should also admit that in this case we're seeking to reverse Judge Godbee, the chief judge of the Northern District, a judge who I have appeared before both in state court and federal court and has said is a great judge, and so we appeal him only with the most respect. Having said that, there are three or four broad issues that I think if we take up briefly we'll separate the wheat from the chaff and move forward. The first one is which we can constantly hear from the federal defendant about condemnation-based damages that we purportedly are seeking in this case. We've never sought any relief concerning the condemnation that's part of this case, in which I am the counsel also. We have not sought to enjoin it. There is no ad damnum clause in our complaint. And the only reason we raise it is because it does show some economic injury. I might add in condemnation, condemnation-based damages are the value of the property taken and the damage to the remainder from that take. We talk about none of that because we aren't seeking it. The only jurisdiction for that case is in the county court at law in Dallas, Texas. And so we do not seek that here. We never have. Number two, there's a lot of talk about economic injury. Economic injury in the NEPA Clean Water Act context is the smallest tail wagging the biggest dog. These are environmental injury cases. It wasn't until the Crosby dredging decision a few years ago that you even could clearly bring a part of these cases for economic injury. And in footnote six of that decision, I believe it is, the court finally reconciles that and says basically you don't have to be pure of heart and you can have economic harm. We aren't really seeking that here. It's mentioned, but the harm we discuss is the harm that would result from the transport of pollutants to and from our property as a part of the inadequate flood protection that may arise. Just to summarize, then, because this is helpful, this sort of threshold. Yes, Your Honor. You're not really disputing, then, the dismissal of the city. The NEPA and CWA claims don't. No, and I'll respond to that, Your Honor. No, no, no. You don't need to waste your time. Well, the city is a 25 percent partner in it, and we included them simply because we thought they'd want to be here. And if they aren't, we don't seek relief against them. And likewise, you're not seeking relief through NEPA and CWA for economic claims. Not really, Your Honor. Our only remedy we seek here is a supplemental environmental impact statement. Okay, I have two, then, just threshold questions, then. The purpose of the litigation, what the SEIS will give you, is to get a better levy, is to delay the levy project, or is to hope to abandon it? Thank you, Your Honor. The issue actually comes up under 40 CFR 1509.2d, which says a supplemental environmental impact statement shall be created when there are significant new circumstances or information relevant to the environmental concerns. It's a procedural right. Exactly, Your Honor. And while we seek an injunction, you'll also see in our amended complaint, we take notice of the O'Reilly case from 2007, which says, you know, we're not going to issue injunctions in all of these, but we will look at remanding it with other instructions. And so as an indication of what we're seeking, we have pleaded, we take an injunction, we would take a remand with no injunction, we would take a remand with no vacature or with vacature. We are just looking for a supplemental environmental impact statement. Why? Two things that really drive our argument are, and then there are more, but you've seen through our pleadings, number one, they have recalculated what's known as the standard project flood. The standard project flood for 40 or 50 years has been the chief element in designing flood protection. And what you did was you calculated through some parameters what would be the standard project flood for that location, and then you applied it to see what protection was needed. That was abandoned in 2018 or 19 because they said it was too rigid, too inflexible, and that it didn't capture the range of storms we were going to encounter. And that lesson learned traces back to Katrina? That is a lesson that starts with Katrina. Go ahead with your second one. Thank you, Your Honor. The second one is they've recalculated the 100-year storm, and the 100-year storm is the metric that's used in order to determine how you can develop in a floodplain and the like. And when you go to develop, you go through FEMA. These two recalculations, it's indisputable in the record so far? Yes, Your Honor. It's indisputable? That goes to a limiting principle question. You're not saying every time there's some catastrophe out there, any project that had been designed before the catastrophe necessarily needs a supplement because surely the Army Corps will have learned something. Right. So what's the limiting principle here? These are the lessons learned are indisputable and significant? The Corps seems to think they are because they keep publishing documents on it. Now, two other points that are ancillary to that, we did an FOIA and we filed a notice in the trial court that reflects we ask the Corps for all the documents that you have that are post-Katrina, that are being used to analyze floods and restrict various things. And they came back and said, and that was in the Fort Worth district only, the district that oversees this area. They came back and said we have none. Well, we list in our pleading 11 different ones that are within the six-year statute from the day we filed suit. There's no question the Corps helped fund the Atlas 14 study that recalculated the 100-year storm. Those are two events. As we list in our complaint, there's a litany of them in the link article, which I think is Exhibit 7, and we in the complaint itself list eight or nine that are within the time period of six years before. Part of my difficulty, this is very clear and helpful, is Judge Gabbi, the July 26 order that you're appealing is a very minimal order. It's just not right. But then it says with prejudice, and we'll hear from the Army Corps, they don't seem to defend it much. So my specific question is, let's say you're right and that's reversible error. What's left of the underlying order, or does the court have to go through constitutional standing differently now that you've given them, the court, quite a bit of material? Do you understand the question? I think I do, Your Honor. I think this court can rule on the standing issue, and I would like to address it because it's simple. This court and the Gulf restoration case, a case on which one of this panel sat, affirmed the Save Our Community ruling from 1992, which I litigated, which says aesthetic and other cares about the environment are enough to raise standing. And, in fact, the Gulf restoration network case says contentions as to aesthetic pecuniary harm are, in fact, sufficient to support standing. That's under the Lujan case. Three affidavits are incorporated with the First Amendment complaint, that of the two plaintiffs and of Barber. Judge Gabbi hasn't yet assessed. Pardon me? Judge Gabbi has not had. When he made his original ordering, he didn't have the benefit of those, right? Oh, no. He had the original ruling where we were dismissed and then repleted. Yes. No. He didn't have that in the record when the first. Because your notice of appeal is appealing to July 7th dismissal of prejudice, but then you do add and all other orders. And I'm sort of thinking, well, there's a lot of complexity in those earlier orders. It would seem that he hasn't even had the chance to look at the affidavits you're speaking to. My focus, therefore, is just to tell you, and opposing counsel, my focus has just been, is this not ripe? Did you do it too early? Let me address ripeness then. I'll say standing is covered by the case I just mentioned. Ripeness occurs for several reasons. The first one is you have to determine if administrative remedies have been exhausted. This project is operating under a record of decision which declares itself to be final action from 1999. It's operating under an environmental impact statement which also constitutes final agency action from 1999 and a supplement from 2003. Now, the Metig case, I think it's pronounced Metig, or Metig, or Rettig, excuse me, which comes from this court, and the federal defendants use it as their statute of limitations argument. I've sort of walked you into a trap in a way because you're saying final is 1999, and mostly what they're saying is actually you're too late. Judge Godbee said you were too early, but you're actually too late. It is ironic that in only these cases can you be both too late and too early, but we're going to suggest there's a nanosecond in there that we hit. And the reason why it's both ripe and not subject to the statute, and remarkably, is in the paragraph in the Rettig case cited by the defendants for the statute of limitations that says how do you reopen these. You know, how do you reopen these things that have gone on for 20 years? And the answer is there's several things, but it does say that if you're challenging in a certain way constitutional or statutory authority, you then look to sustain such a challenge. The claimant must show how some direct final agency action involving the particular plaintiff within six years of filing suit. This is the as-applied doctrine. The as-applied doctrine or the repeated or the ‑‑ it has several different names how it comes up. But, yeah. Is it the letter you got saying we're going to take your land, or is it the funding is now final for this debt? Thank you, Your Honor. There's several cases. It runs through three things. First, there's the authorization of funding, and as we note in our briefing, that's a final action and treated as a final action. There's then the authorization to spend that money, and that's treated by some courts as a final action. There then is the instances where condemnation is a part of these cases, and the commencement of that is treated as final agency action. And then thirdly, as we note, the Ninth Circuit has developed a doctrine on how to reopen these, and it basically says, you know, when the government's moving along with a NEPA process and doing what they're doing, and I thought of this also, I might add, is it fair for you to show up and just sue them? And so that's why we wrote the August 2, 2002 letter, which is modeled on the Clean Water Act Notice of Intent to Sue letter, and it puts them on notice as to what they're doing, and at least in the two ninth cases we cite, they take up the issue of, in these instances, you have to give the agency an opportunity to reconsider it and to make a decision on it. And we would suggest to the court, one way to do that is not to bring it to them in any other way than we did. I sent them a notice letter, I told them I'm going to sue you, and it told them exactly why. It tells them all about the documents they aren't using, tells them about the ones that are within six years. So we would say this case was revitalized, or whatever term we'd use, because of these events that have happened within six years of our filing suit. And so, and I might add, there's another part of rightness I should mention and address, and that is that rightness also turns on whether or not at this moment in time the court can give us relief, and that relief would, without it, we would be harmed. And so, number one, I think it's clear the court can give us this relief, because through the myriad of options we've given it, it can remand, it can enjoin, it can use a combination of those to do an SEIS. Now, how would it harm us if they don't? I think the best thing I've been able to come up with are two points. One, there are cases that say injury, in fact, occurs when a party, or when the agency has put on notice that it needs to do some more environmental investigation and it doesn't, and the failure to do so is that harm. However, we also are going to suffer from one of the other Article III issues, mootness. There's a real possibility that in the time this case could move forward, move back, do whatever might happen or end, this matter would be mooted. I don't think it's mooted by commencement of the condemnation, but I think it could be mooted by the excavation and the actual work. With your respect for Judge Godd, be mine too, where do you think he, what was the misstep he made? Was it he thought, oh, I need to see the actual levee built to know if they used the Katrina data? Well, I think there were two points. One, I think he had a little bit of a misunderstanding of our case because on page three of his order he writes, plaintiffs contend that the levee's design must be deficient and ordering the Corps to perform additional studies must lead to this or that. No, we're arguing the documents are insufficient. The analysis is insufficient. We don't get to a conclusion about the levees because we need this study done. And I notice my time's almost about up. Those were the two other points on rightness. In addition to that, the court ruled, he put some reliance on the fact that design is at 35 percent, and it is. But that doesn't bear on finality or anything else. That just shows how slowly this project is moving. We could argue that it's moving at such a slow pace and joining it and stopping it would be imperceptible because of its speed. And I'll return to those topics. Hold on, hold on. Don't be too quick. Madam Clerk, give him two minutes, add it, and go ahead and address the rest of it. Don't stop short. The government will get there. So I'm giving you two extra minutes on the clock to address any of the other points you didn't get to address. Well, thank you, Your Honor. I think two other points that are very important to the analysis are, number one, the remedies we're seeking. Number two, I think I've explained why we think it's ripe. Number three, there's a statute of limitations argument that the government has raised, and we would suggest that really the analysis in the Meteg case or the Meteg case is of the statute of limitations. The case I was reading from is the one that says, yep, it applies, but the applied rule and all these other ways of describing it. Lastly, they argue that the rights we seek to vindicate are not in the interests that are protected by the statutes that are applicable, NEPA and the Clean Water Act. And the answer to that, of course, is that there are a myriad of cases. We're talking about water quality. We're talking about how water quality is going to be affected when all of these properties are flooded and the contamination that's on them and proven to be by the environmental investigation the federal government did. And they come back and they argue that we're not within the zone of interest, and we would refer the court to Davis v. Coleman, 521 Fed 2nd, 661. The Fifth Circuit, the Sabine River case, 951 Fed 2nd, 669. The Black Warrior case, which we cite from the Eleventh Circuit, which says that water quality is protected. And then lastly, kind of the case we could all read and go to the house on, is once again the Gulf Restoration case. And there were they granted standing. Two of the examples given were the need for water quality for a company that ran a kayak rental place on the Gulf and another one who took photographs. So we fall well within the ambit of the protected interests of both NEPA and the Clean Water Act. Thank you, Your Honor. All right. I knew that the statute of limitations and the zone of interest were there, so rather than deal with it on rebuttal, I wanted to at least get your take on it so when the government comes up, we've got everything addressed. All right. So you've reserved your rebuttal. All righty. We'll hear from Mr. Ecker first. Good morning, Your Honors. What remains of plaintiff's property following the city's condemnation proceedings will be protected by the Cadillac Heights Law? All right, Counsel, you're going to have to project your call and so forth, but you've got to use your theater voice for us to even hear you up here, much less the ones in the back. Of course, Judge Stewart. So the district court dismissed the Clean Water Act and NEPA suit without prejudice, Judge Higginson. That's at ROA 7415. Originally? No, in both contexts. The second time the court denied leave to amend but still dismissed without prejudice. You're sure of that? I'm sure about that. The citation I'm giving there is the dismissal of the amended complaint, and that's in the conclusion section, page 7415 of the record of appeal, on appeal. Because otherwise it would be odd to say something's not right and then say with prejudice. So I'm just wrong on that. That would be an odd procedural posture. But on that issue, I didn't see in your brief much, if any, defense of this NEPA CWA claims not being right. That's correct, Your Honor. We believe the claim is ripe. The issue I think that the district court latched on to is one that I think there are different diagnoses for jurisdictional problems, and I think the more appropriate diagnosis is an Article III standing problem. What the district court said in dismissing the amended complaint was because much is still unknown about the levy's design, that's the first clause, plaintiffs can offer only an attenuated chain of inferences to support their claims that federal defendants' actions put their environmental interests at risk. That's ROA 7414. The only thing I would change about that is I would delete the introductory clause, because I don't think that plaintiffs have shown that their concrete interests are going to be harmed by the Corps' levy at all with respect to the environmental interests they assert. The problem here is that plaintiff's complaint does not explain how a levy designed to protect the Cadillac Heights neighborhood from flooding will, in fact, contribute to the risk that they will suffer harm. The plaintiff's property is already located within a flood plain. The contaminants that they point to in their amended complaint and in the attachments are already on the property. The problem here, fundamentally, is that with respect to their environmental harms, plaintiffs simply do not connect it to the ultimate substantive action of building a levy. And I heard my friend on the other side talk about all they're seeking is additional procedure. And if that is correct, that falls within this court's font for procedural rights cases under the Center for Biological Diversity case, which adopted the D.C. Circuit standard under Florida Audubon. And that is a two-pronged analysis. The first prong with respect to plaintiff's environmental injuries is satisfied. That is that the procedures might change the ultimate result. It's true. The Corps may go back and say, hmm, we ought to design a better levy. Now, I'll say, and this is, you know, I think hinges into the merits a bit, the Corps does continually update its design because it's not a part of its NEPA and Clean Water Act processes. It's a later stage in the process. Setting that to one side. The fundamental problem here is that it is not the Corps' action in building a levy that will cause the harm that plaintiffs point to. Now, plaintiffs cite other environmental cases. And it is true that in many environmental cases, plaintiffs are able to point to specific actions that the Corps or other federal agencies has taken. Building a refinery, building a levy could cause aesthetic harm. It could endanger species. There are a whole host of environmental concerns that could be raised in a case. The problem is that in this case, plaintiffs' assertions relate exclusively to existing conditions on the property. Now, the Corps' levy, as plaintiffs admit in their reply brief, will ameliorate those concerns. Plaintiff's complaint is that it will not do so enough. But the proper baseline for comparison in a procedural rights causation case is existing conditions, where plaintiffs do not point to anything that the Corps' action itself will cause or increase a risk of. It's a property within an existing floodplain, and it's existing contaminants on the property. Can they know that at this point? I'm sorry about that? I mean, can they know that at this point? I mean, at this stage of things, do they have to be prescient to that degree? I mean, at this stage? I think, Your Honor, it is very common for environmental cases like this, for environmental plaintiffs to point to specific harms caused by the agency action, and I think that's an irreducible minimum of Article III standing. And those harms often include things that are specific to the action being taken. You could see part of my puzzlement. I mean, the district court's ruling was ripeness, and you're not defending that. Then we haven't heard you talk about it's too late statute of limitations. That was the bulk of your brief, as I understand it. Maybe not. But then when I'm looking at this portion of the order that you're describing now, no injury, the district court's analysis is just two paragraphs, and it pretty much is what Judge Stewart just asked about, which is it's only 35 percent complete. We just don't know. That's a different argument, because am I wrong that a NEPA claim is asking for information? It's a procedural right. We don't have to wait until the project's done. The whole point is to have the information before the project's over. So where am I wrong in that sort of just very reduced logic? No, I think, Judge Higginson, that is one appropriate path for looking at it. But what I think what it misses is that the Article III standing, three requirements for Article III standing, apply throughout the case. I mean, I think they apply to the pleading here. And so we have given the court alternative bases on which to affirm a dismissal without prejudice on jurisdictional grounds. Right, but I think what you're ‑‑ I thought when you're looking at a procedural right, it's pretty reduced, the injury. The injury is you didn't consider information that could have enormous consequences to the levy that's going to be built right on my property. So, right? Sure. Judge Higginson, I would point the court to Florida Audubon, Judge Sentel's opinion in that case. That's a D.C. Circuit case. This court has adopted the two‑part framework for procedural rights cases. When you talk about a reduced burden for traceability and redressability in the context of a procedural rights case, what that means is that plaintiffs don't have to show that the absence of a procedure caused their harm. In a normal case, you have to show, oh, this legal violation is what caused my harm. You're failing to consider this. There's a possibility I would get a better levy out of this if you had considered and incorporated the new science. Isn't that the test? It is. That's prong one of Florida Audubon. And you're saying they've met that? That's correct. Ah. Prong two of Florida Audubon nonetheless still requires that the court's substantive ultimate action that allegedly lacked the procedure that they proffer, that that ultimate substantive action harms the plaintiff's concrete interests. The problem here is that the concrete interests that plaintiffs have pointed to all relate to existing conditions on the property. So what plaintiffs have pointed to is the fact that future flooding will occur and that that future flooding risks moving contaminants from place to place. All of that is already true. And so the problem here is a fundamental disconnect. Well, why is it already true if you're going to get a much stronger levy like the ones we now have so there wouldn't be all these contaminants moving around this property? With a better levy built with Scotrine information, we aren't going to have all this contaminant maneuvering. Isn't that what their argument is? That is what their argument is. And we're supposed to at the front end? No jurisdiction for a court to consider that argument? The Article III requirement for a procedural rights case has two prongs. And again, Your Honor, I think that all goes to the first prong. I think it goes to the possibility. Doesn't he have a point that the second prong, if we accepted your theory, then it would all be moot. We've got to wait and see this giant thing that's built and then decide? I don't think it's a mootness problem. I actually think it's a problem with the types of injuries that plaintiffs have asserted here. I mean, I think plaintiffs could have asserted injuries that relate to the cores building the levy itself. Perhaps the levy is going to go over a culturally sensitive area. And these are just hypotheticals, right? Perhaps the levy is going to affect an endangered species. Perhaps the levy is going to affect their view of the Trinity River from their property. These are all things that are typical environmental injuries in an environmental case like this. Procedural rights cases where, you know, environmental nonprofits sue and say, hey, look, our members are going to suffer harm because of what you are doing. And that is not met here because what plaintiffs are talking about already exists. And the levy, I understand Your Honor's concern. What plaintiffs are seeking is an even better levy. Or just a levy informed by any data they've had in the last 20 years. And I will just point out, Your Honor, the court does continually update its design and engineering. Again, tinging into the merits, I don't think that's directly before the court. But isn't the standing question really then one that it will get decided that merits? They're saying it will be a better levy. You've got a lot of information from Katrina. It doesn't seem like you're disputing that guidelines have been updated. And if it's a better levy, as we know here in New Orleans especially, you won't have the movement of contaminants. Whereas you did when the levies failed. I have a hard time thinking at the front end. We just say no. You know, all that information people might have liked to have gotten, but you can't even assert it. I'm still not sure why. I understand your concern, Judge Higginson, without trying to sound out. No, you've made it good for you, and I ask things when I'm not even sure at all. So I'm going to study that second prong very closely. Go ahead. Go ahead with your other argument. Thank you, Judge Higginson. The second prong remains a requirement that the environmental plaintiffs point to harms that are caused by the action. And so that's the point we're making with respect to the environment. But here it's inaction. It's the failure to consider lots of new data according to them. You may be able to defeat that, but they're saying things have really changed in the science and engineering and management of these levies. Well, the problem with an assertion like that is that this court and the D.C. Circuit and the Supreme Court in cases like Summers has said that that is essentially a procedural right in vacuo. What you still must show for Article III standing is that that procedural right, and I'm going to talk about prong one and then prong two, and they've satisfied prong one, which is that procedural right might result in a change to the ultimate substantive action. I think plaintiffs have satisfied that because, as Judge Higginson, you've said, they might be able to show, hey, you didn't consider some information and we need more information here. The problem is it is the court's ultimate action that plaintiffs still have to link their harms to. That requirement does not go away in a procedural rights case. And I think Judge Sentel's opinion in Florida Audubon makes that very clear, and I think it explains that in extreme detail because it talks about. Wait a minute, but in Sabine, the court said responsibly, provided this injury is alleged by plaintiff having a sufficient geographical nexus to the site of the challenge project, such that they can expect to suffer whatever environmental consequences. And I thought that one of the fundamental teachings of environmental litigation is the right to service and to identify the particular problem. We know where the land is. We know what the potential consequences are. It hasn't been looked at for several years. I haven't looked at the Trinity River for about half a century for the law office and the federal building. I'm not unfamiliar with that, and that is not exactly a case development in the rapids, if you see. It's been a slow go. These people own the land, and there's a lot of changes that are going on with Mother Nature up and down that Trinity Basin while the court is contemplating what they're going to do. But I thought the procedural right specifically is, is it alleged by the plaintiff to have a sufficient geographical nexus to the site of the challenge project. We know that. Such that they can expect to suffer whatever environmental consequences the project may have. Your evidence there is a quarter of a century old. So if you look at the terms of exposure of a risk, as the policy choice made by these acts, that awareness of the risk, identification of the risk, as being the mediation of the rights, the seal rights, but ultimately the vindication of the policy choice to protect the environment. I was going to throw out a general observation, but these people's land are plainly, yes, it's already been affected. But that doesn't fully answer the question. Sure. So Judge Higginbotham, if I can pick up on that thread, I think there's two points I'd like to raise. First, you're right, Judge Higginbotham, there's no dispute about geographic nexus here. I think that's something that often comes up in environmental cases where you have non-profits who are suing, whose members maybe recreate in the area, but don't actually live there. I mean, here, plaintiffs live there. We have no concerns about the geographic nexus being met here. The problem is the rest of that requirement, which is geographic nexus and that the harms will be felt. But the harms that plaintiffs plead, and they had a chance to amend their complaint to plead it twice, the harms that plaintiffs plead all relate to things that are already happening on the property. And I see my time is nearly up, but I would just emphasize that the harms that plaintiffs point to, and I'm not saying that they couldn't point to other harms. Right? This case has been dismissed without prejudice, and there are other harms that others have alleged successfully a group of environmental plaintiffs sued in the year 2000 and established standing based on exactly this. But part of this is somewhat circular. Part of the problem is that they need the effort to surface what the problems are, not if you already know what the problems are, that's one thing. You know the potential risk, but in terms of the environment, with a quarter of the censure data you're operating under, you're... I understand your concern, Judge Higginbotham, and I think if the court has concerns and believes that the traceability prong has been met, that it ought to remand for further proceedings and not reach the other issues that we've raised on this appeal. Further proceedings, such as what? I'm sorry? Remand for further proceedings, such as what? Excuse my boy. Well, this case didn't make it past the preliminary injunction stage. I understand. And so there's not been, I believe, I don't know whether, I don't remember for sure whether there's been an answer file, but we're really at the beginning of this case, as Judge Higginson has pointed out, and the problem is a failure on the pleadings. So if the court believes that... We're blessed with a fine district judge and some bad counsel. And I understand, Judge Higginbotham, the points the court is making about, you know, the potential staleness of the data and just getting to the merits at this stage. I think the problem is simply the plaintiff's failure to allege facts that link the harms that they point to to the levy itself. You're still standing on the statute of limitations argument? Your Honor, we've raised statute of limitations because it is an alternative jurisdictional ground, and we do stand on that argument because it is another basis on which to affirm for lack of jurisdiction. It is another basis on which to affirm dismissal without prejudice. All right. I gave, you know, the other side a little extra time to cover his ground, so I know you had questions, but if there are other points you want to make, I don't want to cut you short. The only other observation I would raise is that plaintiffs appear to rely at argument today exclusively on their environmental harms. I heard plaintiffs walk away from condemnation-based or economic harms, so I think there are portions of our briefs that you can ignore, both sides' briefs that you can ignore. We don't, for example, assert statutory standing or a failure of the zone of interest with respect to the environmental harms. That's only relevant to the economic harms. What I will also say, Judges, is that the supplementation claim, which I think is the sole basis for plaintiffs saying that there's a live claim here, that is only relating to NEPA. So I think even if this Court partially remands, I think the Clean Water Act claim, there's no similar supplementation requirement, and plaintiffs haven't pointed to anything like that. Every time plaintiffs talk about an ongoing duty, they talk about NEPA. They don't talk about the Clean Water Act. So I think even in that context, there would need to be a partial affirmance. With that, I'll rest in the briefs. On his side, he points to the as-implied doctrine and their three events. It would seem to me that might restart your 60-year clock. So two problems with that, Your Honor. We raised statute of limitations below in both PI briefs, both preliminary injunction briefs. Plaintiffs raised only the supplementation brief in reply both times. So I think the only thing that was preserved below is the supplementation idea. Now, I will also say the as-applied challenge only applies when there's a new subsequent final agency action. The actions that plaintiffs point to are actually implementation of an existing approval. So these are things that the district court didn't have an opportunity to get into. I think if there are concerns on statute of limitations, I think that warrants a remand rather than this court taking it up in the first instance. All right. Thank you, sir.  All right. Ms. Phones. May it please the court, Kathleen Phones for appellee city of Dallas. What's left? I don't know that there is anything left for us. The appellants have essentially conceded that there is no claim and no relief that they are seeking against the city. And therefore, we would ask that this court affirm the district court's dismissal of the city for lack of standing. If there are any questions, otherwise, we'll rest on our briefs. That's as clean an argument as we've had all week. Because I didn't ask any questions. I didn't say that. I just said the argument was. Thank you. All right, counsel. You've got rebuttal. Well, it's not a matter of no. You may not be sure, but I'm very sure. I'm very sure. Just a few points in rebuttal. Nice try. The framework for this is really important. About this, everything's already here and we're complaining about the present. 1509.2 says, SEIS shall, mandatory, be prepared if a major federal action, we have that, remains. Obviously, we still have it remaining because it's 35% design. Remains to occur. And there are significant new circumstances or information relevant to the environmental concerns and bearing on the proposed action or its impacts. That's the standard. It doesn't have to do with what's current. It has to do with what has to be looked at. I'm sure you were going to, but speak to the two points. One's factual. Did you plead in the amended complaint harms that don't already exist? Well, yes, Your Honor. And I'll tell you why. Thank you. Here's why. Friedman's case, 446, Fed Third, 808, 2006, out of the Eighth Circuit. Injury, and we pleaded this, injury under NEPA occurs when an agency fails to comply with that statute. For example, by failing to issue a required environmental impact statement. The injury, in fact, is increased risk of environmental harm stemming from the agency's allegedly uninformed decision making. That's exactly what we pleaded. And when you plead, you're saying, is it really the way I described it, which is without a good levy, the contaminants could contaminate more of our property? Is that essentially it? Right. I mean, that's the outcome, but we can't get there because we need the documentation to analyze it. He implies that when I go back and actually read, not reread, but Judge Santel's opinion in Florida Audubon, and I get to the second prong, it is going to suggest that what you've just described as valid injury isn't. Are you familiar with that case? Pardon me? Are you familiar with the case he was relying on Florida Audubon, Judge Santel's decision, and the second prong, that even when you're looking for a process right, information, it still ties to the ultimate project? Did you hear his explanation? Well, actually, I couldn't hear much of any of it, and if I understand what the court is saying, it can't be tied to what is current. It has to be tied to some harm that is occurring or going to occur. You have to allege specifically a harm that would be avoided thanks to the new information you say wasn't considered. Well, certainly we're suggesting, and, in fact, they take us to task on page 19 of their brief, and they say we did not plead what I'm about to mention to the court, but on page 6 of our amended complaint, paragraph 18, it exactly pleads that if the agency gets this information, it is likely they would change their mind on this decision, and ultimately what we argue, you're correct, we can't conclude it. We can allege it that if this doesn't occur, we're going to have increased transport of pollutants based on additional flooding that we would have since we did not investigate the new standard project flood, the 100-year storm and the like. And so that's our ultimate outcome on it. Part of that goes to redressability also, and that, too, is included in the Gulf restoration case, and they talk about it's redressable and that we don't need to show the procedural remedy we're requesting will, in fact, redress the injuries. We must only show there's a possibility that it will, and we've certainly pleaded that. Was I wrong that Judge Godby dismissed with prejudice? Well, I don't want to say you were wrong, Your Honor, but when I read it, I'm pretty certain that it's without prejudice, and this also goes to their statute of limitations argument in that there's no mention of the statute of limitations. The statute of limitations is inapposite to lack of ripeness or standing. The court's saying we don't even have a cause of action. And then secondly, they say, and there's a big footnote about it, that a statute of limitations, even in 12b-6 motions, is jurisdictional. Well, if it had been jurisdictional, it's also incurable. It would have been with prejudice if this was a statute of limitations case. I know they can still raise it. You finish by saying there's no supplementation requirement connected to the CWA. No, there's not. What's connected to the CWA, thank you, and we argue, is that they did not do the, when you have a civil works project and not a permit, the Army Corps has to fulfill the same kinds of studies that you would if you were a permit going to get a permit, Clean Water Act permit. They've done none of that here. That's the Clean Water Act case. We don't emphasize it. One last note, and I apologize. The court had mentioned, or Judge Higginbotham had mentioned, how all of the environment's changing. Two things. Dallas, right now, one of the 21st century storms we talk about, rains for seven days, doesn't stop. It's because of the climate circulating this storm. This hasn't been studied. It's flooding Dallas. Houston flooded four weeks ago in what's called a derecho, Spanish for the word right. And the reason it's called that is because it deals with straight-line winds. I don't know who had heard of straight-line winds before a year ago, but every weather report you hear nowadays talks about straight-line winds. Those are the two climatological events that are happening. And remarkably, and I apologize, I'll stop. Yesterday in the Wall Street Journal, there was an article that said, summer travel, don't worry about the airports, get ready for the severe storms and the derecho. That's what we need to plan for. It's going to affect this city much more than it is Dallas, but it's going to affect Dallas also. Are you spelled derecho? Sir? Are you spelled derecho? Oh, I believe it's D-E-R-E-C-H-O, Spanish word for right. And I guess that's because the winds come right at you. If the court has no further questions, may we be excused. All right, thank you, counsel, both sides, an interesting case. This concludes the panel's work for this week, the orally argued case as well as the non-orally argued case.